## Case No. 7,064.

### The IRMA.

[C Ben. 1; 6 Am. Law Rev. 763; 15 Int. Rev. Rec. 130.] [1]

District Court, E. D. New York. March, 1872.

Martin & Smith, for T. Darling & Co.
Beebe, Donohue & Cooke, for Cummings.

BENEDICT, District Judge. The cases against this vessel have been brought before me, on an application for an order determining the priority of the respective demands in the distribution of the proceeds of the vessel, which are insufficient to pay all the claims against her. The only question which calls for any particular examination has arisen between the libellants, Timothy Darling & Co., whose libel is filed to recover the amount of a botomry bond executed by Cummings, as master of the vessel, and Cummings himself, who has filed his libel to recover a balance due him for his own wages and for advance of wages made by him to the crew. If the demand of Cummings be paid out of the proceeds of the vessel, in preference to the bottomry bond, the remainder will be insufficient to pay the bottomry bond in full, and therefore the bottomry lenders contest the right of the master of the vessel to priority over the bottomry bond. The position taken is, that the master is personally liable to the bottomry lenders for the sum borrowed, and that, supposing that he has a lien for his demand, he cannot be paid in preference to the bottomry bond, when such payment will create a deficiency in the bond, which he is liable to make good.

The question raised is one which has sel-

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 6 Am. Law Rev. 763, contains only a partial report.]

dom arisen, owing, doubtless, to the fact that in very many, if not in most, cases of bottomry, the master binds himself personally for the debt by means of a special covenant inserted in the bond, and is not therefore in a position to dispute his liability for any deficiency that may arise from the distribution of the proceeds of the ship. But in this instance the bottomry bond contains no such covenant, and the master denies any liability whatever to the bottomry lenders for any part of the bottomry loan. I am, therefore, called on to determine the question of law, whether, in the absence of any special agreement to that effect, the master of a ship incurs any personal liability to repay to the bottomry lender the amount borrowed on bottomry, when the bond becomes due by the safe arrival of the ship, and the proceeds of the ship and freight prove insufficient to discharge it in full.

In considering this question, I am not required to speak of the liability of the ship master for neglect or malfeasance, nor of a case where the bottomry bond proves invalid, or where no risk has ever attached, or where the stipulated voyage is not performed, or where the ship and freight is not abandoned to the bondholder; nor yet of a case where the bond is executed by an owner of the ship. What I have occasion to say is, therefore, intended to refer to the case here presented, where it is sought to hold the master personally liable for the loan, where the bond is a valid bottomry bond, executed by the master as such, in a foreign port, for a voyage which has been duly performed, and where the ship and freight are applied, so far as they will go, to the payment of the bond, and where the master has made no special agreement to be responsible for the loan.

Upon this question, I remark, first, that the bottomry lender, in order to establish a personal liability on the part of the master, cannot resort to the general liability, which the master of a ship is presumed to incur for debts contracted and advances made in behalf of the ship. The implied contract of the master, arising, under the general rule of the maritime law, out of an advance of money for the ship, is extinguished when a lawful contract of bottomry is made, and the debt has been put at risk. All other obligations merge in the new contract, which places the lender in a new and different relation to the vessel, and it is to the rights and obligations arising out of the contract of bottomry alone that the lender must thereafter look. [The holders of a bottomry bond are not therefore ordinary lien creditors, nor are they holders of a mortgage.] [2]

The contract of bottomry, which is not only a contract of great sanctity, but also of great peculiarity, is not a mere agreement for security. "It is neither a sale, nor a part-

nership, nor a loan, properly speaking, nor insurance, nor a compound of different constructions—undique collatis membris—but it is a contract having a specific name (un contrat nommé), and a character peculiar to itself." Emerigon, Contrat a la Grosse, c. 1, § 2. When once the bottomry risk has attached, the creditor becomes a bottomry lender, and nothing else. "He who lends money on bottomry makes a contract which is to be followed out in all its remedies as such." Curtis, J., The Ann C. Pratt [Case No. 409]; Bray v. Bates, 9 Metc. (Mass.) 250; The Ann C. Pratt, 18 How. [59 U. S.] 63. The holders of a bottomry bond are, therefore, not holders of a mortgage, and the rules applied in cases of mortgage have little or no application here.

But although the only contract, on which these bottomry lenders can rely, is the contract of bottomry, it does not follow that they have not, by that contract, the personal liability of the master, upon the safe arrival of the ship, notwithstanding the circumstance that the instrument given to bind the ship does not expressly provide for any personal liability of the master. A personal liability on the part of the master, in case of the safe arrival of the ship, may form part of a valid contract of bottomry, as has often been held where that liability had been stipulated for in the bottomry bond.

The question here is, whether such a liability does not, by implication of law, constitute an element in every such contract, as, for instance, it does in the contract with the seamen. These bondholders maintain that such personal liability is implied by the maritime law, and that it can be resorted to, at least to make good any deficiency, after exhausting their remedies against the vessel and freight.

In support of their position the words of Lord Tenterden are cited, where he says the remedy of the lender on bottomry is "against the master or the ship" (Abb. Shipp. (5th Ed.) p. 156), and also the statement in Kent's Commentaries (volume 3, p. 355), that "for the repayment of a sum borrowed on bottomry the person of the borrower is bound, as well as the property charged." These two citations from the high authorities named will be found, on examination, not to be to the same point. The borrower alluded to by Chancellor Kent is not the master, but the owner of the ship, as the context shows. On page 360 the master will be found spoken of as distinguished from the borrower. So understood, the citation has no direct bearing on the question under discussion. The remark of Lord Tenterden must be understood as referring to such a bond as he describes in a subsequent paragraph, and sets out at length in his appendix, which contains a special covenant on the part of the master. Abb. Shipp. p. 160.

Reference is also made to the general principle of the maritime law, according to

---

[2] [From 15 Int. Rev. Rec. 130.]

which the master of the ship is presumed to bind himself personally in every contract made on behalf of the ship, as showing the existence of such a liability in the contract of bottomry. But if such were the rule in all other cases, it would afford little reason for supposing the liability to exist in a contract of bottomry, for bottomry is a contract "resembling nothing and being consistent with nothing but itself". (Curtis, J., The Ann C. Pratt [supra]); and I am of the opinion that the reasons, on which the general rule rests, will be found to be for the most part wanting in the case of bottomry. Take for instance the reasons which led to the personal liability of the master to the crew. The master is personally liable to the seamen, for sailors, because of well known traits, must have every security possible to prevent them from losing their wages and becoming objects of charity. They naturally look for their wages in the first instance to the master, who commands them during the voyage, who provides them their food, who cures them when sick, and punishes them when they disobey; and from long usage he thus becomes personally bound for their wages. Another instance is the personal liability of the master for the bills of material men, and for advances of money. Obligations of this class derive their distinctive character from the fact that they are generally made in foreign ports, where they are to be discharged, and where the owners are not; and it is therefore permitted to look to the master, who is present, leaving him to reimburse himself from the owners, when he returns home. Considerations of this character, coupled perhaps with the fact, that in the earlier history of navigation, as well as afterwards on the revival of commerce in the Middle Ages, the master almost invariably was an owner, unless he was a slave (Macl. Shipp.), led to the establishment of the presumption of personal liability on the part of the master in contracts made for the ship, as a "usage and custom of the seas." But it will be difficult to find in the maritime law any trace of such a presumption in cases of bottomry; and the considerations which press in favor of it, on other occasions have in such contracts little force. The lender on bottomry is not ignorant and poor like the sailor. He becomes beneficially interested in the voyage. His loan is never to be repaid in the foreign port, where it is effected, but on the contrary is payable where the owners are supposed to be, or to have funds; and the ship is specifically bound. No necessity therefore exists for the personal responsibility of the master. Furthermore, great injustice must follow, if such a personal responsibility, on the part of the master, be attached by the law to the contract of bottomry, because the master is without remedy over against the owners of the ship, for any sum thus extracted from him, notwithstanding

the fact, that the owners receive the benefit of the loan. This results from the character of the transaction, and the nature of the liability on the part of the ship owner, which grows out of it. The owner of a ship is indeed said to be liable for a bottomry bond as well as the ship, if the ship arrives safe; but this is not a liability arising from a contract of the owner, made by the hand of his agent, the master, with the bottomry lender. The master of a ship although an agent of the owner, is also in a certain sense a public officer. The master of a ship is "not an ordinary agent—but one of a special kind, sui generis." Sir R. Phillemore, The Thetis, 22 Law T. [N. S.] 277. "He is a known and public officer." Sea Laws, art. 2, of the masters of ships. "The rights and duties springing out of the position of ship master are of a public character." Bedarride, Com. de Code, liv. 2, tome 2, art. 359. "The master of a ship has a threefold responsibility: to the owners, to the freighters, and to society—the state." 1 Boulay-Paty, 383. "Though he (the master) receive a salary, yet he is a known and public officer." Molloy, book 2, c. 2, § 2. The contract of bottomry, when made by the master, is made by him, to a certain extent, in an official capacity. He does not, in a transaction of that character, act simply as agent of the owners, but as master of the ship. It is not within the scope of the ship master's authority, as the agent of the owners, to bind them personally as his principals, by a bottomry contract. The owners are liable when the vessel comes to them safe, but not because of the acts of their agent in borrowing money for them. Theirs is an original liability to the holder of the bottomry bond, arising out of their possession of the property bound for the loan, namely, the ship and freight. This peculiarity in the liability of the ship owner, growing out of bottomry, is pointed out by the supreme court of the United States, in the case of The Virgin, where the court says: "In England and America, the established doctrine is that the owners are not personally bound, except to the extent of the fund pledged, which has come into their hands; to this extent indeed they may correctly be said to be personally bound; for they cannot subtract the fund and refuse to apply it to discharge the debt. But in this case, the proceeding against them is rather in character of possessors of the thing pledged, than strictly as owners." The Virgin, 8 Pet. [33 U. S.] 538 –554. The later authorities in England and America are to the same effect. The Ann C. Pratt [Case No. 409]; Stainbank v. Fenning, 6 Eng. Law & Eq. 421. Not only is such the law in England and America, but the same law exists upon the continent. By the German mercantile code, which in respect to such a subject may be presumed to state the rule of the maritime law as understood throughout a large part of Europe, it

is declared (article 680, pt. 7) that the bottomry creditor can enforce his claims only to the extent of the bottomried objects, after the arrival of the vessel. The maritime law as administered in France appears to be the same.

If then the owners of a ship are not rendered directly liable by a contract of bottomry made by the master, they cannot be rendered indirectly liable, through a liability on their part to the master for any sum exacted of him by reason of the contract. And if the master be without remedy over against the owner of the ship, it is not to be supposed that he can be held personally liable, and thus compelled to bear, without recourse, the burden not only of a loan effected solely for the benefit of the ship owner, but also of the maritime interest; and that too when he is compelled by the responsibility of his office to effect the loan, whether willing or not to assume such a burden. The unjust effect of such a rule warrants the supposition, that it does not exist in the maritime law. Aside from its injustice, there is reason against it, founded in public policy; for to make the master by operation of law liable for the payment of the bottomry bond, or even for the deficiency after the ship and freight are exhausted, is to offer him an inducement to lose the ship, inasmuch as her safe arrival will cast upon him a responsibility which he escapes if she does not arrive. A rule which would in any case place the interest of the mariner in opposition to the welfare of the ship, would be contrary to the whole spirit of the maritime law.

These considerations, which are of a nature entitling them to much weight in determining a question of maritime law, appear to me sufficient to warrant a rejection of the doctrine contended for by this bottomry lender, and I find no adjudged case which impels me to a different conclusion. No case has been cited by the advocates, where the doctrine in question has been sustained, and I find a decision to the contrary in the English admiralty, where the same question arose in the same way, and where the determination was that the master of the ship had not ceded his prior right against the ship by taking up money on bottomry. Dr. Lushington says: "Here the master has not bound himself personally to pay the bond. His covenant in the bond is that he is master, and therefore he has authority to charge the bark, cargo, and freight, and that the bark, cargo, and freight, shall at all times after the voyage be liable to the payment of the money. He has not, therefore, incurred that personal liability which a master giving a bottomry bond generally incurs in express terms." The Salacia, 1 Lush. 548. Many remarks will be found scattered through the other cases in the English admiralty which I have above cited, looking in the same direction.

See, also, The Edward Oliver, 2 Marit. Law Cas. p. 507; The Jonathan Goodhue, Swab. 524. It may, therefore be said that the authorities in the English admiralty are adverse to the position here taken by the bondholder. The continental writers are directly opposed to such a position. Thus Emerigon (Traité de Contrats a la Grosse, c. 4, art. 12, § 4) says: "If in the bottomry bond the master has bound himself and his goods (of which I have seen a thousand examples), he is held personally, in spite of the fact that he acted in the known capacity of agent, because he has rendered himself bound for the bond, and the lenders have trusted his credit. If, then, the vessel arrives safely, they may compel the master himself to pay the principal and the maritime interest which he has in his own name promised to pay. But if he has contracted only in the capacity of captain, the lenders, in case of the safe arrival of the ship, will be limited to an action in rem against the vessel and freight, without recourse to the owners, who abandon the property, or to the master, who, having contracted only in a qualified capacity, is not responsible for the unfortunate result of the voyage." Emerigon cites the ordinance in his support. Later continental authority is to the same effect. Bedarride declares that the master cannot be held personally liable for the payment of a bottomry bond which he has signed in his capacity as master for the necessities of the ship. Com. de Code de Com. liv. 2, tit. 9, § 931. And again (section 935) he says: "On principle, therefore, the master, borrowing money on bottomry, contracts no personal obligation, neither on the part of the owner, nor with the lender; but with the exception that it is always lawful for the captain to bind himself directly and personally. The German mercantile code, already referred to, restricts the personal liability of the master on a bottomry contract to those cases where the master has arbitrarily changed the voyage, or arbitrarily deviated, or has improperly assumed new sea risks, and then gives him the opportunity to relieve himself by proving that the non-payment of the bond has not been caused through the change of voyage, or through the deviation, or through the new sea risk. Article 694, pt. 7. And the 18th admiralty rule of the supreme court of the United States clearly recognizes a similar rule of law. Indeed, the 18th admiralty rule goes far to compel the determination of this court in this case adversely to the bottomry lenders upon the question under consideration, although their libel is not in conflict with the rule.

My conclusion, therefore, is, that in the present case no personal liability for any part of the loan has attached to the shipmaster, and the bottomry lender and the master must, therefore, in respect to order of payment upon this motion, be declared to be subject to the general rule by which wa-

ges are entitled to be paid in preference to a bottomry bond. But this is upon the assumption that the master has a lien upon the ship, as averred in his libel. The present being a motion founded upon the respective libels alone for the simple purpose of determining, at this period of the controversy, the question of priority, in order to save expense, the right to a lien is not put at issue. If it is intended to question that right, an issue must be framed by answer or exception, upon which a decree may be rendered.

Upon this motion the order will be that in the distribution of the proceeds in the registry, any decrees that may be entered upon the libels before me will be satisfied out of the proceeds in the following order: first, the wages decreed the mate; next, the pilotage decreed Eugene Gallagher; next, the sum decreed Cummings, the master; next, the sum decreed Timothy Darling upon the bottomry bond. The priority of the other demands among themselves need not be determined, as the demands above mentioned will absorb the whole fund.